UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WAYNE B. GAEDTKE,

                  Petitioner,

v.                                     Case No. 3:05-cv-1074-32HTS

WALTER A. MCNEIL,[1]
et al.,

                  Respondents.

_____

## ORDER

    Petitioner Wayne Gaedtke was arrested and charged with a sex crime involving a minor, a first degree felony carrying a maximum sentence of thirty years. He then spent thirty-four days in the St. Johns County Jail without seeing a lawyer. When he was finally brought to court for his en masse arraignment, the judge told the assembled group of defendants that any plea offer made at arraignment is "always" the best offer they will ever get and it is only good for that day. At the same proceeding, Gaedtke was

_____

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Walter A. McNeil is substituted for James R. McDonough as the proper party Respondent having custody over Petitioner.

appointed a lawyer who knew nothing about his case beforehand, received the plea offer from the State, consulted with the lawyer in the adjacent jury room for fifteen to thirty minutes, came back, pleaded guilty and was immediately sentenced to fifteen years. That this process, referred to by the State as "blue light specials at arraignment,"[2] leaves much to be desired is obvious. The more difficult question is whether it is so lacking that Gaedtke was denied the effective assistance of counsel. The Court concludes that while Gaedtke's counsel's performance was constitutionally deficient, he was ultimately not prejudiced thereby and is therefore not entitled to habeas relief.

### I. Status

Gaedtke, proceeding *pro se* and *in forma pauperis*, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to 28 U.S.C. § 2254. Gaedtke also filed an Initial Brief (Doc. #8) in support of the Petition. Gaedtke challenges a 2004 state court (St. Johns County, Florida) judgment of conviction for lewd or lascivious molestation on the following grounds: (1) the plea was involuntarily entered due to the trial judge's threats; (2) ineffective assistance of trial counsel for failing to investigate, failing to move to suppress Petitioner's and his wife's statements, failing to inform Petitioner of the constitutional rights he would waive by entering

---

[2] Doc. #54 at 7.

his plea, failing to object to the trial judge's threats and for advising Petitioner to enter the no contest plea; and, (3) the no contest plea was involuntarily entered because he was not informed of the rights he would waive by entering the plea.

Respondents filed a Response to Petition (hereinafter Response) (Doc. #9) with exhibits in support of their Response.[3] Gaedtke has responded. Doc. #13.

The Court appointed the Federal Public Defender to represent Gaedtke and ordered additional transcripts. Doc. #17. The Court then held a pre-hearing status conference and ordered supplemental briefing on a procedural default issue. Doc. #31. After reviewing those briefs (Docs. #33, #35) and considering the case further, the Court determined that an evidentiary hearing was necessary.

On February 6, 2009, this Court conducted an evidentiary hearing. See Transcript of the Evidentiary Hearing (hereinafter EH Tr.) (Doc. #50). The parties filed post-evidentiary hearing memoranda. Docs. #52, #53. This case is now ripe for review.

## II. One-Year Period of Limitations

Gaedtke's Petition is timely filed within the one-year period of limitations. See 28 U.S.C. § 2244(d); Response at 3-4.

---

[3] Respondents' exhibits will be hereinafter referred to as "Ex." See Notice of Filing Exhibits (Doc. #11), exhibits A through E; Supplemental Appendix (Doc. #16), exhibits F and G.

# III. Procedural History

On March 30, 2004, Gaedtke was charged with lewd and lascivious molestation. The Information stated:

> WAYNE BRUCE GAEDTKE on or about March 9, 2004, in the County of ST. JOHNS and State of Florida, WAYNE BRUCE GAEDTKE, a person 18 years or older, did unlawfully and intentionally touch A.M., a person less than 12 years of age, in a lewd and lascivious manner the breast, genitals, genital area, or buttocks, or the clothing covering them {or} did force or entice A.M. to so touch A.M. in that WAYNE BRUCE GAEDTKE did [touch] the clothing covering her vaginal area, contrary to Florida Statute 800.04(5)(a)(b). (1 DEG FEL.)

Ex. E, Information.

On April 15, 2004, Gaedtke was arraigned before the Honorable Robert K. Mathis, Circuit Judge for the Circuit Court, Seventh Judicial Circuit, in and for St. Johns County, Florida. Ex. G, Transcript of the Arraignment Proceeding (hereinafter Arraignment Tr.). Shortly thereafter that same day, Gaedtke entered a no contest plea to the charge. Ex. A, (hereinafter Plea Tr.). Pursuant to the terms of the negotiated plea agreement, he was sentenced to fifteen years of incarceration. Id. at 3, 7; Ex. E, Judgment. Gaedtke did not appeal.

Gaedtke filed a *pro se* motion for post conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he raised the following claims: (1) the plea was involuntarily entered due to threats by the trial judge, who allegedly stated that he would

4

sentence everyone who refused to take a plea that day to the maximum sentence; (2) his counsel was ineffective for failing to investigate his case, failing to move to suppress his and his wife's statements, recommending a guilty plea and failing to object to the trial judge's threat of a maximum sentence; and, (3) his plea was involuntarily entered because he was not informed that, by entering the plea, he was waiving some of his constitutional rights.  Ex. B.  In denying the Rule 3.850 motion, the trial court identified the two-prong <u>Strickland</u> ineffectiveness test as the controlling law and stated in pertinent part:

> The Defendant was charged with one count of lewd and lascivious molestation. He entered into a 'best interest' plea agreement with the State (no contest), was adjudicated guilty, and was sentenced to a term of 15 years['] imprisonment.  He did not appeal his judgment and sentence directly, and this is his first relevant postconviction motion.  His Motion is otherwise procedurally sufficient.
>
> In his Motion[,] the Defendant sets out three claims for relief.  In his first claim, the Defendant asserts that the trial judge coerced him into taking a plea.  In his second claim, he asserts that his attorney was ineffective for failing to investigate his case and failing to act in his best interests. In his third claim[,] the Defendant asserts that his plea was involuntary because he was not informed that by entering the plea he was giving up some of his constitutional rights.
>
> . . . .
>
> As to the Defendant's first claim, he argues that he was told by the trial judge that he could either "take the State's plea bargain, or [be sentenced] to the maximum

5

sentence." This claim is clearly refuted by the record of the Defendant's plea and sentencing hearing. See Exhibit A.

As to the Defendant's second claim, he asserts that his attorney performed no research on his case, conducted no investigation, and urged him to plead guilty. The defendant, however, does not indicate how these supposed deficiencies affected the outcome of his case, and does not allege that he was prejudiced in any way by his attorney's actions. Since the Defendant has failed the prejudice prong of <u>Strickland</u>, there is no need to determine whether his attorney's conduct was actually deficient.

The Defendant's final claim is that his plea was involuntary because he did not know that by entering a plea he would be waiving a number of constitutional rights. This claim is clearly refuted by the record. See Exhibit A, 5:25-6:11.[4]

Ex. C at 1, 3.

The appellate court per curiam affirmed without issuing a written opinion. <u>Gaedtke v. State</u>, 908 So.2d 1080 (Fla. 5th DCA 2005); Ex. D. Gaedtke's *pro se* motion for rehearing was denied. Ex. D. This federal habeas petition followed.

---

[4] <u>See</u> Plea Tr. at page 5, line 25, through page 6, line 11 (setting forth Gaedtke's affirmance that he was present when the trial judge previously informed him of his constitutional rights and that he heard and understood those constitutional rights). After being informed that by entering the plea of no contest he would waive those constitutional rights and "a further trial of any kind," Gaedtke did not have any questions for the trial judge. <u>Id</u>. at 6.

# IV. Standard of Review

> The Anti-Terrorism and Effective Death
> Penalty Act of 1996 (AEDPA) governs this
> [action] and limits [this Court's] review of
> the decisions of the state courts:
>
> > A federal court may not grant a
> > petition for a writ of habeas corpus
> > to a state prisoner on any claim
> > that has been adjudicated on the
> > merits in state court unless the
> > adjudication (1) resulted in a
> > decision that was contrary to, or
> > involved an unreasonable application
> > of clearly established federal law,
> > or (2) resulted in a decision that
> > was based on an unreasonable
> > determination of the facts in light
> > of the evidence presented in state
> > court.
>
> Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th
> Cir. 2003) (citations omitted). . . .

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th

Cir.), cert. denied, 546 U.S. 1064.   Furthermore, AEDPA also

directs that a presumption of correctness be afforded to factual

findings of state courts, which may be rebutted only by clear and

convincing evidence.   See 28 U.S.C. § 2254(e)(1).

Finally, for a state court's resolution of a claim to be an

adjudication on the merits, so that the state court's determination

will be entitled to deference for purposes of federal habeas corpus

review under AEDPA, all that is required is a rejection of the

claim on the merits, not an opinion that explains the state court's

rationale for such a ruling.   Parker v. Sec'y for the Dep't of

Corr., 331 F.3d 764, 776 (11th Cir. 2003), cert. denied, 540 U.S.

1222 (2004).  Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under AEDPA, § 2254(d).

## V. Procedural Default

Acknowledging that Gaedtke has exhausted his state remedies, Respondents nevertheless contend that ground two, the ineffective assistance of counsel claim, is procedurally defaulted because the state habeas court found that Gaedtke had insufficiently alleged prejudice.  Respondents argue that because Gaedtke's ineffective assistance claim was not properly presented to the state court and that it can no longer be properly litigated under state procedural rules, it must now be considered procedurally defaulted and therefore barred from federal review.  The Court disagrees.

First, it is not clear that the state habeas court found that Gaedtke had failed to allege prejudice as part of his ineffective assistance of counsel claim.  While the state habeas court does say that Gaedtke "does not allege that he was prejudiced in any way by his attorney's actions[,]" the court also states that Gaedtke "has failed the prejudice prong of <u>Strickland</u> . . . ."  Ex. C at 3. Thus, the ruling is ambiguous as to whether the state habeas court found Gaedtke's allegations of prejudice deficient or whether it ruled against him on the merits of his prejudice claim.  Thus, the habeas court did not "clearly and expressly state that it [was] relying on state procedural rules" in denying Gaedtke's

8

ineffectiveness claim. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001) (citation omitted). Moreover, it is not clear that the state court's ruling meets the other two requirements under <u>Judd</u>, that the state court ruling be independent of federal law and that the state procedural rules be adequately applied. <u>See</u> Doc. #33 at 8-17. Finally, in an analogous situation, the Eleventh Circuit in <u>Williams v. Allen</u>, 542 F.3d 1326, 1345 (11th Cir. 2008), <u>petition for cert</u>. <u>filed</u>, (U.S. Feb. 11, 2009) (No. 08-1032), rejected an argument that a habeas petitioner's claims were procedurally defaulted, finding that the petitioner had "presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." <u>Id</u>. (quoting <u>McNair v. Campbell</u>, 416 F.3d 1291, 1302 (11th Cir. 2005), <u>cert</u>. <u>denied</u>, 547 U.S. 1073 (2006)).

Considering Gaedtke's *pro se* status at the time of his filing the Rule 3.850 motion, the nature of the allegations and Eleventh Circuit precedent, the Court concludes that Gaedtke has not procedurally defaulted his ineffective assistance of counsel claim.[5]

---

[5] The Court notes that Gaedtke clearly alleged prejudice in his brief on appeal from the denial of the Rule 3.850 motion, contending that "[w]ith ad[e]quate assistance of counsel, [he] would have plead not guilty, thereby the results of <u>these proceedings</u> would have been different, thereby fulfilling both prongs of <u>Strickland v. Washington</u> . . . ." Exhibit D at 6. The appellate court per curiam affirmed.

## VI. Ineffective Assistance of Counsel

As explained by the Supreme Court of the United States:

> Under 28 U.S.C. § 2254, [Petitioner's] entitlement to federal habeas relief turns on showing that the state court's resolution of his claim of ineffective assistance of counsel under Strickland v. Washington, . . . "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1). An "unreasonable application" occurs when a state court "'identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, supra, at 520, 123 S.Ct. 2527 (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'CONNOR, J.)). That is, "the state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable." Wiggins v. Smith, supra, at 520-521, 123 S.Ct. 2527 (quoting Williams v. Taylor, supra, at 409, 120 S.Ct. 1495 (internal quotation marks omitted)).

> Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, 466 U.S., at 687, 104 S.Ct. 2052, with performance being measured against an "objective standard of reasonableness," id., at 688, 104 S.Ct. 2052, "under prevailing professional norms." Ibid.; Wiggins v. Smith, supra, at 521, 123 S.Ct. 2527.

Rompilla v. Beard, 545 U.S. 374, 380 (2005).

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional

norms.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003) (quoting

<u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984)).

The Eleventh Circuit has expounded upon the deference due to

counsel's performance as well as to the state court's decision

concerning that performance:

> In assessing [Petitioner's] claim that
> his trial counsel were ineffective we must
> keep in mind that "[j]udicial scrutiny of
> counsel's performance must be highly
> deferential." <u>Id</u>. at 689, 104 S.Ct. at 2065.
> In addition to the deference to counsel's
> performance mandated by <u>Strickland</u>, the AEDPA
> adds another layer of deference--this one to a
> state court's decision--when we are
> considering whether to grant federal habeas
> relief from a state court's decision.
> <u>Woodford</u>, 537 U.S. at 24, 123 S.Ct. at 360
> (section 2254(d)(1) imposes a "highly
> deferential standard for evaluating
> state-court rulings") (internal marks and
> citation omitted). [Petitioner] must do more
> than satisfy the <u>Strickland</u> standard. He must
> also show that in rejecting his ineffective
> assistance of counsel claim the state court
> "applied <u>Strickland</u> to the facts of his case
> in an objectively unreasonable manner." <u>Bell
> v. Cone</u>, 535 U.S. 685, 699, 122 S.Ct. 1843,
> 1852, 152 L.Ed.2d 914 (2002).

<u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004), <u>cert</u>.

<u>denied</u>, 544 U.S. 982 (2005); <u>see</u> <u>Minton v. Sec'y, Dep't of Corr.</u>,

271 Fed. Appx. 916, 917-18 (11th Cir. 2008) (citation omitted),

<u>cert</u>. <u>denied</u>, 129 S.Ct. 926 (2009).

## VII. The Record Evidence and Summary of the Evidentiary Hearing

Gaedtke was arrested on March 11, 2004, for lewd or lascivious molestation upon his four year old step granddaughter and was given a first appearance the following morning, at which time he was told that an attorney would be appointed at a later date. However, Gaedtke remained in custody from March 11, 2004, through April 14, 2004, thirty-four days, without seeing a lawyer. He was then brought to the St. Johns County Courthouse for arraignment on April 15, 2004, at 9:00 a.m., at which time the trial judge addressed a large group of defendants, including Gaedtke. Gregory B. Allen (an Assistant State Attorney) and James Edward Jacobs (an Assistant Public Defender) were present at the group arraignment. The trial judge addressed the group of defendants as follows:

> You folks are here today for the purpose of arraignment on criminal charges.
>
> An arraignment is a time when the charge is read to you, and you have the right to enter one of three pleas.
>
> A plea of not guilty denies the truth of the charge. If you plead not guilty, I will set your case for trial.
>
> A plea of no contest admits the truth of the charge. It has the same legal effect as a guilty plea. It says, I chose not to defend.
>
> And of course, a plea of guilty means you're admitting you're guilty. And if you plead either no contest or not [sic] guilty, the only thing that will be left to do is to sentence you.

Arraignment Tr. at 3.

The court then advised the group of its constitutional rights and concluded by saying:

> **You may be offered a plea bargain by the State Attorney's Office today.  It is totally up to them as [to] whether or not they offer you something.  Totally up to you as to whether or not you take the offer.**
>
> **The plea offer that's made at arraignment is always the best offer that is ever made, and it's only good for today.  Still up to you as to whether or not you take it.**

Id. at 4-5 (emphasis added).

Shortly thereafter, the trial judge appointed Jacobs to represent Gaedtke.  Plea Tr. at 3.  That same morning, Jacobs had been given the discovery[6] by the State; the State's plea offer was also first given to Jacobs at the arraignment, and Jacobs then met with Gaedtke for the first time.  Both Jacobs and Gaedtke testified that Jacobs reviewed the discovery while consulting with Gaedtke about the State's plea offer.  Their discussion lasted from fifteen to no more than thirty minutes in the jury room adjacent to Judge Mathis' courtroom, while Judge Mathis continued to hear other cases

_____

[6] See Respondents' List of Exhibits and Witnesses (Doc. #25), attached Affidavit of James Edward Jacobs (Doc. #25-2) and attached Public Defender's file (Doc. #25-3), which contains the Information, the Order Declaring Defendant a Sexual Predator, the Felony Docket Record, the Uniform Commitment to Custody, the Judgment and Sentence, the Plea Offer form, the Criminal Punishment Code Scoresheet, the Case Summary, the Witness List, the SA798 Charging Affidavit form, the Probable Cause Affidavit, the Felony Warrant, the Incident Report, the witnesses' affidavits, Gaedtke's affidavit, the Investigative Supplement and the constitutional rights form.

and likely within earshot of other defendants and their lawyers.[7]

After this brief meeting, Jacobs and Gaedtke lined up in the courtroom "ready to put the plea colloquy on the record." EH Tr. at 203. Once back in the courtroom before the trial judge (with the prosecutor and Gaedtke present), Jacobs stated:

> In this matter, we have negotiated a plea agreement. Gaedtke will tender a best interest no contest plea. This is a first-degree felony. The State has offered him 15 years DOC. He indicates that under the circumstances that he wishes to take advantage of that offer.

Plea Tr. at 3. When the trial judge asked Gaedtke whether he wished to enter the plea, Gaedtke confirmed that he did. Id. at 4.

The trial judge then informed Gaedtke of the maximum penalty for the first degree felony of lewd and lascivious molestation.

> Mr. Gaedtke, lewd and lascivious molestation is punishable by up to 30 years imprisonment, a $10,000 fine -- $15,000 fine or both such fine and imprisonment.
>
> If you have a prior qualifying offense, you could be declared to be a sexual predator, you at least must be declared to be a sexual offender. And if you have, you could be subject to commitment under the Jimmy Ryce Civil Commitment Act. I can't tell you if you do because I don't know anything about your record.
>
> . . . .
>
> You may be considered for probation or lesser sentencing. I'm not promising you any

---

[7] Gaedtke said the meeting occurred in the jury box in the courtroom; Jacobs said it took place in the jury room.

particular sentence, but I wanted you to understand the possibilities.

Id. at 4, 5.

The trial judge then inquired as to Gaedtke's education and occupation. Id. at 5. Gaedtke informed the trial judge that he was a high school graduate, can read and write and was a tool and dye maker. Id. Gaedtke confirmed that he had never been treated for any mental or emotional disability and did not currently suffer from any mental disorder. Id. Gaedtke also acknowledged that he had not had any alcohol or narcotic drug in the last twenty-four hours. Id.

The trial judge then spoke to Gaedtke about the constitutional rights he would be waiving by entering the plea.

> THE COURT: Were you here earlier when I advised everyone of their [c]onstitutional [r]ights?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Did you hear and understand those [r]ights?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: By the entry of this plea, you waive, that is, you give up these [r]ights and there'll not be a further trial of any kind.
>
> Do you have any questions so far?
>
> THE DEFENDANT: No, sir.

Id. at 5-6.

The trial judge confirmed that Gaedtke had decided that the plea was in his best interests and had not been promised anything or threatened to enter the plea.

> THE COURT: Do you believe that your plea of no contest is in your best interest?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Has anybody used any threats, force, pressure or intimidation to make you plead no contest?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Other than the plea bargain, has anyone promised you anything to get you to plead no contest?
>
> THE DEFENDANT: No, sir.

Id. at 6. Further, Gaedtke acknowledged that he had talked to Jacobs, his attorney, about the case and that he was satisfied with Jacobs' representation. Id. at 6-7.

Thereafter, the prosecutor set forth the factual basis for the plea:

> On or about March 9, 2004, Gaedtke, date of birth 10-15-53, did then and there unlawfully and intentionally touch A.M., a person less than 12 years of age in a lewd and lascivious manner on or about her breasts, genitalia area or the clothing covering her genitalia area, contrary to Florida [S]tatute 800.04(a)(b).

Id. at 7. Defense counsel stated: "No contest as far as to the proffer." Id.

The trial judge inquired as to whether Gaedtke still wanted to enter the plea, and Gaedtke affirmed. _Id_. The trial judge concluded:

> I will accept your plea. You're adjudged to be guilty of the offense. You are committed to the custody of the Department of Corrections for a term of 15 years. You will be given credit for 35 days time served.

_Id_. The trial judge then inquired as to whether Gaedtke qualified to be a sexual offender. _Id_. The prosecutor responded that Gaedtke had a prior offense. _Id_. at 8. The following colloquy ensued.

> THE COURT: Then he must be adjudged to be a sexual predator, and the registration thing will be explained to you later.
>
> . . . .
>
> [THE PROSECUTOR]: We are not -- the scoresheet is not showing the prior because it was in '86 and we don't have confirmation of the probation or the supervision. Although it was terminated within the last ten months, so it's not on the scoresheet.
>
> THE COURT: It's not on the scoresheet, but if he does have that, then he has to be declared to be a sexual predator.
>
> [THE PROSECUTOR]: The NCIC [National Crime Information Center] shows a conviction, yes, sir.

Id. at 8.[8]  Gaedtke was then remanded to custody to begin service of his fifteen-year sentence.

At the evidentiary hearing held in this Court, Gaedtke testified that, at the arraignment, the trial judge gave an opening statement to all of the defendants in the courtroom that there would be a one-time plea offer made that would not be valid after that day and that if they did not take the plea offer, they would be sentenced to the maximum sentence.  EH Tr. at 16, 32.  At that time, he was not represented by Jacobs.  Id. at 16-17.  Once Jacobs was appointed, Jacobs "picked up a file," he and Jacobs discussed the case in the jury box, and Jacobs advised him to take the plea offer.  Id. at 17-18.  Gaedtke testified that Jacobs was "flipping through the pages" of the file, closed the file, said that the State had everything it needed and advised him that the maximum was thirty years as opposed to the plea offer of fifteen years.  Id. at 22-25.

Gaedtke testified that his understanding of the plea was that he would plead no contest and then proceed with a jury trial.  Id. at 25-26, 28, 42-43.  Gaedtke stated that his recollection of the proceeding differs from the transcript of the arraignment, but acknowledged that the arraignment proceeding "moved very quickly."

_____

[8] Gaedtke was ultimately designated as a sexual predator. See http://offender.fdle.state.fl.us/offender/flyer (website for the Florida Department of Law Enforcement Sexual Offenders and Predators).

Id. at 29, 30, 32. He noted that his discussion with Jacobs lasted approximately fifteen minutes and that he told Jacobs about his conversations with the interviewing detective, his wife's conversations with the detective, how the statements were taken under coercive circumstances, including threats against his wife, how his wife could be contacted and that he did not molest his granddaughter. Id. at 27, 34-35. Gaedtke acknowledged that he did discuss his version of the case with Jacobs, but felt handicapped by the lack of privacy in their conversation. Id. at 34-38. He explained that, while there were only three people in the house at the time of the incident (Gaedtke, his wife and granddaughter), he wanted Jacobs to interview other people who had access to his home during the time in question and who could have visited with no prior notice. Id. at 39-41, 47.

James Edward Jacobs (Gaedtke's attorney at the arraignment, plea and sentencing proceedings) testified that he was appointed to represent Gaedtke at the April 15, 2004, arraignment and that Judge Mathis, during arraignment, would tell the defendants that "usually" this is going to be the best offer, and typically it was the best offer. Id. at 163, 169-70, 197. He recalled speaking to Gaedtke at the arraignment for between fifteen and thirty minutes in the jury room of Judge Mathis' courtroom. Id. at 164, 197. He had received the State's "discovery exhibit" that same morning, reviewed it and talked to Gaedtke about the paperwork and the plea

offer.  Id. at 164, 190-91.  He stated that his notes on the Information reflect the substance of their discussion: best interest, no contest plea; fifteen years in the Department of Corrections with his initials "JEJ" next to the notational entry; "Jimmy Ryce Act explained[;]" "credit for 35 days[;]" "sexual predator[;]" "30 yrs" circled, with "pot[ential,]" indicating he had explained to Gaedtke what his maximum exposure was for the first degree felony; and "written confession[,] admitted touching girl."  Id. at 165-66.

Jacobs testified that he would have explained the minimum sentence and the maximum exposure and the implications of the Jimmy Ryce Act.  Id. at 166-67.  He recalled that Gaedtke, with six prior felonies, was not a first-time felony offender.  Id. at 168-69.  He explained the posture of the case: Gaedtke, realizing he needed therapy, did not contest the matter; three individuals (Patricia Mackey, Gaedtke's stepdaughter; Derrick Mackey, the victim's father; and Frances C. Gaedtke, Gaedtke's wife) made consistent statements; Gaedtke admitted touching his granddaughter and never said his confession was coerced or that he was told what to write down in his written confession; the child victim had been interviewed by Child Protective Services; Patricia Mackey had stated that Wayne Gaedtke, her stepfather, had a history of child sexual abuse, dating back to when she was five years old and that he had victimized her and her older sister Jennifer; Gaedtke

indicated to him that he had this prior problem in Virginia when he was in the Navy and his stepdaughters were younger; the Case Summary and the Probable Cause Affidavit, both contained within the discovery exhibit, noted that "[a] records check revealed 6 prior felony convictions for Wayne Gaedtke back in 1986, for sexual abuse against his own stepdaughters." Id. at 170-71, 183, 193, 195, 199. Jacobs stated that, after conferring with the client, "[w]e would line up in Judge Mathis' courtroom when we were done and ready to put the plea colloquy on the record." Id. at 203.

Jacobs opined that there was no reason to request a continuance for any investigation. Id. at 184. He noted that, if a defendant were to hesitate about accepting the State's plea offer, he would ask the prosecutor to hold the plea offer open until the next court appearance, and usually a prosecutor would agree if there is a legitimate reason. Id. at 205. He recalled that "[i]n Gaedtke's case, he didn't make any hesitation about wanting to accept that offer." Id. at 206, 208. While noting that Gaedtke may not have liked the State's offer, Jacobs did not recall that Gaedtke wanted him to make a counteroffer or that Gaedtke ever wanted him to investigate certain facts of the case. Id. at 206.

Jacobs testified generally that "it was a pretty garden-variety-type plea bargain." Id. at 171, 182, 183. He stated:

> [I]t's typical contract law. Offer was made.
> Defendant accepted. We consummated it on the
> record. And that was pretty much [the] end of
> the story. Obviously, I had a colloquy with

21

> him and I explained certain things to him. So
> he went into the plea with eyes wide open.
>
>          . . . .
>
> I saw no exceptional circumstances where this
> was an extended period of time. I mean, the
> plea was offered to him. It was offer. It
> was acceptance. It was basic first-year
> contract law, you know, masking as criminal
> law.

Id. at 183. Jacobs acknowledged during his testimony that he had no independent recollection of Gaedtke's case, but was refreshed by reviewing the file.

James S. Purdy is the current Public Defender of the Seventh Judicial Circuit of Florida (which includes St. Johns County) who was elected in November of 2004 and took office in January of 2005 (after Gaedtke's plea); he was not familiar with the particular facts of this case. Id. at 50-51, 94. He stated that when a plea offer is made at the arraignment, sometimes it is the best offer, and other times it is not, depending on how the case progresses. Id. at 54, 88, 89-90. He was "surprised to hear" that Judge Mathis said that the plea offer that is made at the arraignment is "always" the best offer and is only good for that day; he has heard judges say it is "typically" the best or "usually" the best plea offer. Id. at 88. While referring to the American Bar Association's standards for criminal defense attorneys, he explained that defense counsel may engage in plea negotiations with a prosecutor; however, under no circumstances should a defense

counsel recommend to a defendant acceptance of a plea unless appropriate investigation and review of the case has been completed, including an analysis of the controlling law as well as the evidence likely to be produced at the trial. _Id_. at 59-62.[9]

Purdy opined that he "would be very uncomfortable recommending any client take a plea of 15 years that [he] had not had an opportunity to investigate." _Id_. at 76. "[T]he expediency issue of moving cases through the system, because of the high volume of cases, has overwhelmed the duties of the attorney to adequately represent his client in each individual case." _Id_. at 91-92. If faced with the State's response that it would not guarantee that the offer would remain on the table after the arraignment, Purdy testified that he would explain the following to his client:

---

[9] The American Bar Association Standard 4-4.1, Duty to Investigate, states:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. **The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.**

Petitioner's Evidentiary Hearing Exhibit 1, American Bar Association Standard 4-4.1, Duty to Investigate, subsection (a) (emphasis added).

I would have to pass on to the client
that this is the State's offer.  I can't
recommend that you take it, because I don't
know what the facts are.  I haven't had an
adequate opportunity to investigate the case.
If you want to take it, it's there.  They're
telling me that they're withdrawing the offer
at the end of this arraignment proceeding.

I can't guarantee that it will be there,
you know, at your first pretrial.  And I would
explain to them, I don't think it's fair.  I
don't think that it's -- that you should have
to make this choice.  But I cannot recommend
that you take it, because I haven't had an
opportunity to look at your case, particularly
having not met him before that day.

. . . .

And there were cases where I would plead
somebody out at arraignment, where I had had
an opportunity, because I had met him within
five to ten days of his arrest, had talked to
the prosecutor about it, [and] had discussed
plea negotiations.

And the client would have known going
into the arraignment what his plea offer was,
because there had been that contact.  That was
something that was totally lacking that I see
in St. Johns County.

. . . .

**If he is facing a state prison sentence,
then I don't think [a plea at arraignment is]
adequate.  I'm sorry.  That's - if he's going
to prison for a case where the plea offer is
at arraignment and you haven't had an
opportunity to look into it, you might as well
not be there.**

. . . .

**If the file is something that shows that
it's a serious offense, I think that -- that**

> **you should at least ask for additional time,**
> **barring being given additional time to prepare**
> **the case, or to do the investigation.**
>
> You should not be recommending to the
> client that he take -- take a plea to a -- to
> a long prison term without having adequate
> investigation done.
>
> .   .   .   .
>
> They [(the ABA guidelines commentaries)]
> do mention that -- the investigation can be
> rather short to be adequate. **It doesn't have**
> **to be a -- you know, a full-blown, cover-**
> **every-detail investigation. It has to be an**
> **adequate investigation to determine to the**
> **satisfaction of the attorney that the best**
> **interest[s] of the client are to resolve the**
> **case at that point.**
>
> **And I just -- I have -- personally have a**
> **hard time with resolving a case for 15 years**
> **or 30 years or 10 years on a case that is not**
> **bottom end of the guidelines, at arraignment,**
> **where you haven't had an opportunity to at**
> **least satisfy yourself. I just would have a**
> **difficult time sleeping with myself if I were**
> **doing that.**

Id. at 77, 78-79, 80, 82 (emphasis added).

William Charles Fletcher testified as an expert witness regarding what criminal defense attorneys should do when presented with a plea offer at arraignment. Id. at 96. He stated that, when assigned to a case charging lewd and lascivious molestation with a victim under the age of twelve (a first degree felony), the first step for an effective attorney is to review the discovery materials. Id. at 100. It is necessary to meet with the client for a lengthy discussion about the charges, police reports, any

statements that were made and the circumstances under which they were made, his prior convictions, the applicable law (including the Jimmy Ryce Act), similar act evidence, court procedures and the differences among a guilty plea, a no contest plea and a not guilty plea. Id. at 101, 122. He explained that this process is a lengthy one that could take several weeks; it cannot be done in one meeting for thirty minutes. Id. at 101-02, 115. Just looking at the file for a few minutes was not sufficient. Id. at 106. He concluded that his overall concern about this case "is the speed at which this case was brought to court and resolved." Id. at 120.

In referring to Gaedtke's written statement, he noted that, in addition to wanting to know about the circumstances of that statement, an effective attorney would want to know all the circumstances that led up to his making that statement to determine if a motion to suppress should be filed. Id. at 102. Further, it would be important to interview the witnesses who made statements. Id. at 103-04. Additionally, he stated that the child victim's videotaped interview, being "one of the most critical pieces of evidence in a case like this," should be reviewed before advising a client. Id. at 105. And, finally, there should be an inquiry into whether a particular witness would have a motive to lie. Id. at 106.

Fletcher's experience in St. Johns County is that the first offer received at arraignment is not always the best offer. Id. at

107, 118. Typically, there is a "natural wearing down of both sides[,]" so the plea offer may get better. <u>Id</u>. at 107-08. He recalled that Gaedtke's scoresheet showed a minimum sentence of seventy-eight months and a maximum sentence of thirty years. <u>Id</u>. at 111. He noted that, taking into account Gaedtke's prior record (not shown on the scoresheet), the minimum guidelines sentence would increase, but maybe not to as high as the offered fifteen years. <u>Id</u>. at 111-12, 123.

Fletcher further testified:

> Q. Now, after reviewing the documents in this case, you're aware that Gaedtke pled nolo contendre, or no contest, to a first-degree felony of lewd and lascivious?
>
> A. Yes.
>
> Q. And he was sentenced to 15 years?
>
> A. Yes.
>
> Q. And that was pursuant to a plea offer?
>
> A. Yes.
>
> Q. You were also aware that he met his attorney for the first time the day he entered the plea and was sentenced?
>
> A. According to the two transcripts that I was given, yes. He met them and then entered a plea on the same day.
>
> Q. In your expert opinion -- or in your opinion, was it objectively reasonable for a criminal defense attorney to advise Gaedtke to take a plea of 15 years in this case?
>
> A. **I cannot see how getting a case on the 15th of April, or whatever day it was, and**

**presenting a 15-year offer on the same day, and having the client accept that offer all in the same day -- I don't know how an attorney can believe in that situation that he has been effective in any way.**

Q.  And why do you say that?

A.  Well, in this particular case, when I -- when I read the transcript, I know the judge said, at the early part of the arraignment -- I think he was saying this to everybody in the audience, or however many people were there, that the offer you get today is -- the offer that you get at arraignment is always the best offer.

And, to me, as the defense attorney assigned to whatever case is out there, I've got to go tell every single one of my clients that that's just not true.

**So that's how you -- so that's how this case sort of started off.  He's being told by the judge that this was the best offer you're going to get.  And that's just false.  But it's the judge saying it to the defendant.**

**But other than that, then meeting your client and being appointed to represent him, I don't know how you can do everything that you need to do, that it's your duty to do as a defense attorney, within that short amount of time, and then enter a plea on his behalf.**

.  .  .  .

Q.  In light of that standard [(ABA standard 4-4.1, Duty to Investigate)], what do you feel in this case was Mr. Jacobs' duty to investigate Gaedtke's case?

A.  **I think that overall what bugs me the most about this particular case is the speed at which this case was brought to court and resolved.**

> **As a defense attorney, I just don't think
> you can allow yourself to be put into a
> situation where you're getting a person's case
> and you're plea[d]ing him out at -- almost
> simultaneously.  You have to spend some time
> with him.**
>
> **And I would say that about just about any
> felony, but particularly a sex case.  Because
> of the ramifications with Jimmy Ryce, the
> Jimmy Ryce Act -- with a case that involves a
> 15-year first offer, it just seems like you
> have to spend a little bit more time with your
> client.**
>
> You've got to go have a one-on-one
> meeting with them at the jail -- that's where
> he was -- and go over every single one of
> those police reports, all the statements.  And
> if there are videos, you've got to let them
> watch the videos to see what he's being
> accused of.
>
> **You have to do a -- your own job --
> whether he's admitting it to you or not, you
> have to spend some time with them to make sure
> that he thoroughly understands what's going
> on.  And I don't' think that was done in this
> case.**

Id. at 117-18, 120-21 (emphasis added).  On cross-examination,

Fletcher acknowledged that the State's case against Gaedtke was

"strong."  Id. at 122.

Former Judge Mathis, now an Assistant State Attorney,

testified that the procedure of the State's making plea offers

which were good for the day of the arraignment "was an attempt to

move cases more quickly off the docket and to get people out of

jail more quickly."  Id. at 132, 138.  He noted that, by 2004,

seventy-five to eighty percent of the third degree felony cases and

some of the more serious cases were disposed of by this procedure at the arraignment. Id. at 139, 140. However, a homicide case would not be considered under this procedure due to the potential for post-conviction litigation, and the procedure was not designed for habitual offenders. Id. at 142, 143, 144-45.

His experience was that the plea offer at arraignment was the best offer, but "[o]bviously things could change during discovery or the course of the case that might change that offer." Id. at 133, 139. He testified that he did not threaten to impose a statutory maximum sentence if Gaedtke did not accept the plea offer. Id. at 134. He explained that, if Gaedtke had said anything during his plea colloquy that made it clear that he did not want to go through with the plea, he would not have taken the plea. Id. at 135. Or, if Gaedtke had inquired as to when he was proceeding to trial, Judge Mathis would have rejected the plea. Id. He noted that, while he was the state court judge at that time, he has no independent recollection of Gaedtke's case. Id. at 139-40.

Gregory B. Allen (the prosecutor) testified concerning the procedures used in April 2004. Id. at 147-48. He never heard Judge Mathis threaten to impose a statutory maximum if Gaedtke did not accept the plea offer. Id. at 151. Allen did not have any independent recollection of his discussions with Jacobs about Gaedtke's case. Id. at 152. He explained that, after the

Information was filed, the Public Defender's Office (if appointed) would send a list of names to the State Attorney's Office, requesting discovery. Id. at 154-55. He stated that they disposed of all types of felonies at arraignment, including some homicide cases. Id. at 157. If a defendant wanted to speak with a family member about the plea offer or wanted to explore retaining counsel, the offer might stay on the table longer than the one day. Id. at 148-49, 157. And, after arraignment, the plea offer was subject to change, depending on a multitude of factors. Id. at 158.

## VIII. Decision

### A. Guilty Plea Claims (Grounds One and Three)

Grounds one and three were rejected on the merits by the state trial and appellate courts and therefore must be addressed applying the deferential standard for federal habeas review of state court adjudications, as required by AEDPA. According the proper deference under AEDPA, the Court finds grounds one and three to be unmeritorious. While the Court has deep concerns with the manner in which Gaedtke's case was handled in the state court, those concerns properly manifest themselves in the ineffective assistance claim.

Gaedtke's primary argument under ground one is that the trial judge "threatened" him with the statutory maximum sentence if he did not plead guilty. He claims that the transcripts of the day's proceedings on April 15, 2004, do not contain all of the judge's

statements. However, there is no basis to believe that the official transcript is not complete; that transcript shows no threat by the trial judge. It is possible, as Gaedtke's counsel suggests, that in the excitement and given the rushed nature of the proceedings, that Gaedtke misheard or misperceived the judge when the judge advised the assembled group of defendants that "[t]he plea offer that's made at arraignment is always the best offer that is ever made, and it's only good for today." Arraignment Tr. at 5. While the Court deems this statement by the trial judge to be inadvisable at best, it does not rise to the level of a "threat," as Gaedtke suggests, especially given that the trial judge also told the group that it was "[t]otally up to you as to whether or not you take the offer." Id. at 4-5. Morever, there is no indication that the trial judge made any statement to the effect that if a defendant did not take the State's offer on that day, that defendant would ultimately be sentenced to the maximum penalty. Thus, Gaedtke was simply mistaken about what was said, and his contention that the trial judge threatened him is without merit.

With respect to ground three, Gaedtke's allegation that he was not properly advised about his constitutional rights or the consequences of giving up his jury trial rights when he pleaded no contest is again belied by the record. At the group arraignment, the trial judge gave a relatively detailed statement of the rights

of defendants including the "right to plead not guilty and . . . [the] right to trial by jury as to your guilt or innocence." Id. at 4.

Moreover, at the later plea colloquy, the trial judge directly asked whether Gaedtke had heard the earlier recitation of his constitutional rights, whether Gaedtke understood them and also told Gaedtke that "[b]y the entry of this plea, you waive, that is, you give up these [r]ights and there'll not be a further trial of any kind." Plea Tr. at 5-6. Gaedtke told the judge that he understood and that he had no questions. The trial judge further confirmed that Gaedtke had decided that the plea was in his best interest and he had not been promised anything or threatened in any way to enter into the plea.[10] While Gaedtke actually has framed

---

[10] The trial judge did fail to advise Gaedtke of his right to appeal. While Gaedtke mentions this, he does not assert it as a separate ground for relief. See Petition at 9; Doc. #53 at 12. In determining the voluntariness of the plea, the trial judge shall determine that the defendant understands:

> that upon a plea of guilty, or nolo contendere without express reservation of the right to appeal, **he or she gives up the right to appeal all matters relating to the judgment**, including the issue of guilt or innocence, but does not impair the right to review by appropriate collateral attack[.]

Fla. R. Crim. P. 3.172(c)(4) (emphasis added). However, the trial judge's "[f]ailure to follow any of the procedures [set forth in Fla. R. Crim. P. 3.172] shall not render a plea void absent a showing of prejudice." See Fla. R. Crim. P. 3.172(j).

Further, the trial judge, when he renders a final judgment of conviction or imposes a sentence, shall inform the defendant of his

ground three as alleging a failure of his appointed public defender to advise him of his rights and the rights he was giving up by pleading no contest, it is clear that whatever failures his appointed counsel may have made in that regard, the trial judge more than adequately explained Gaedtke's rights to him and the consequences of his no contest plea.

While, again, the circumstances under which Gaedtke entered his plea do cause concern, with respect to grounds one and three, the Court cannot find that the state courts' adjudications of these claims were contrary to clearly established federal law, involved an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts in the light of the evidence presented in state court. Therefore, this Court cannot award habeas relief on grounds one and three.

---

right to appeal and the time allowed by law for taking an appeal. See Fla. R. Crim. P. 3.670; Lee v. State, 813 So.2d 275 (Fla. 5th DCA 2002) (finding that petitioner, who was seeking a belated appeal based on his allegation that when he entered his guilty plea the trial court failed to advise him of the right to appeal, was entitled to a hearing to determine if his allegation was correct, and if so, if the reasonable diligence component of belated appeal relief had been met). It is noteworthy that a defendant who pleads guilty or nolo contendere to a criminal offense waives the right to appeal the judgment entered on the plea except as to dispositive issues expressly reserved for review and a narrow range of issues relating to the validity of the plea and sentence. See Fla. R. App. P. 9.140(b)(2)(A)(i) and (ii).

## B. Ground Two (Ineffective Assistance of Counsel Claim)

### 1. Deficient Performance

In <u>Hill v. Lockhart</u>, 474 U.S. 52, 58-59 (1985), the Supreme Court held that "the two-part <u>Strickland v. Washington</u> test applies to the challenges to guilty pleas based on ineffective assistance of counsel."  First, the convicted defendant must show that counsel's representation fell below an objective standard of reasonableness.  Second, to show that the convicted defendant was prejudiced by counsel's errors, he "must show that there is a reasonable probability that, but for counsel's errors, he would have not pleaded guilty and would have insisted on going to trial." <u>Id</u>. at 59 (footnote omitted).

While the focus on the first part of this two-part test is counsel's performance, the structural framework within which Gaedtke's counsel was operating must also be addressed.  The problems began on March 11, 2004, when Gaedtke, already in custody, made his initial appearance by video conference.  Although this initial appearance was not transcribed, it is clear that no counsel was appointed for Gaedtke at that time;[11] indeed, counsel was not appointed for Gaedtke until thirty-four days later at his

_____

[11] <u>See generally</u>, <u>Rothgery v. Gillespie County</u>, 128 S.Ct. 2578, 2581 (2008) (citations omitted) ("[T]he right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.").

arraignment. Had counsel been appointed before the April 15, 2004, arraignment, counsel could have visited his client, reviewed discovery, and done whatever investigation of Gaedtke's case was warranted before considering whether to recommend to his client that a plea offer be accepted at that arraignment.[12]

Systemic problems continued when Gaedtke was finally brought to court for arraignment. Still without counsel, Gaedtke, along with all other defendants at the en masse arraignment, was told by the trial judge that if the State made a plea offer that day that "[t]he plea offer that's made at arraignment is always the best offer that is ever made, and it's only good for today." Arraignment Tr. at 5. Former Judge Mathis testified that this admonition was part of a "policy" that he had instituted in "an attempt to move cases more quickly off the docket and to get people out of jail more quickly." EH Tr. at 132. However, he acknowledged that the policy, as properly implemented, was intended to deal only with the less serious cases:

> We were trying to find a way to get the people out of jail that we knew were going to be placed on community sanctions anyway, and to relieve some of the caseload on the

---

[12] Public Defender Purdy testified that budgetary constraints and high caseloads can handicap his lawyers from doing all the tasks they would like to do in representing a client. This is no doubt true (and this problem has likely worsened since 2004). Nevertheless, while acknowledging these "real world" issues, they cannot deter the Court from its duty to determine whether the representation Gaedtke received fell below the floor mandated by the Sixth Amendment.

> attorneys by getting cases out that did not
> require a tremendous amount of work, so that
> they could spend more time on the cases that
> did. . . .

Id. at 138.  Former Judge Mathis acknowledged that the policy was inappropriate for serious cases such as homicide or habitual offender cases, although he noted that it had been used in "some" of the more serious felonies (as it obviously was in Gaedtke's case).

While no doubt well-intended and maybe appropriate for less serious cases, as applied to serious felony cases, such as Gaedtke's first degree felony case charging lewd and lascivious conduct on a minor carrying a thirty-year maximum penalty and Jimmy Ryce Act implications, this "policy" creates an environment where a Sixth Amendment violation is much more likely.  For a defendant such as Gaedtke, who had been incarcerated without benefit of counsel for thirty-four days, to appear before the judge, still without representation, and be told that the plea offer he receives on that day, which is only good for that day, is "always" the best plea offer he will ever receive, puts both the defendant and his yet-to-be appointed counsel at a distinct disadvantage.  Moreover, as it turned out, the trial judge's statement from the bench that the State's plea offer made that day was "always" the best offer, was an overstatement.  All of the witnesses -- the prosecutor, the Public Defender, Jacobs and even former Judge Mathis himself -- acknowledge that, if the plea offer is not accepted at arraignment,

circumstances could later dictate that the State would make the defendant the same plea offer again, or perhaps even a better one (or the offer could get worse). Moreover, prosecutor Allen testified that upon request, and if circumstances warranted, the State would leave the plea offer open past the arraignment.[13] Nevertheless, the potentially coercive effect of the judge's statement from the bench that the State's offer that day would "always" be the best offer cannot be overstated.

Even granting all this, however, once counsel was appointed for Gaedtke, he was required to render effective assistance within the meaning of the Sixth Amendment. Given the extremely serious nature of the charges facing his client, the Court is compelled to conclude that Jacobs' representation of Gaedtke was deficient. It is objectively unreasonable in these circumstances for Jacobs to have allowed his client to plead guilty to a first degree felony charge of lewd and lascivious conduct and agree to a fifteen-year sentence with exposure to continued civil commitment under the Jimmy Ryce Act and designation as a sexual predator after having spent fifteen to thirty minutes working on the case. Jacobs had never met Gaedtke before he was appointed in the courtroom. He simply perused the discovery file, which had just been handed to him by the State, spent a very few minutes with Gaedtke in a

---

[13] Of course, Gaedtke would have had no way of knowing that at the time.

public, or, at best, semi-private setting adjacent to the trial judge's courtroom and then returned Gaedtke to the courtroom to plead him guilty.

All of the relevant guidelines and commentary, as well as the witness testimony of Public Defender Purdy and criminal defense attorney Fletcher at the evidentiary hearing, agreed that even in these circumstances in which Gaedtke had signed a statement admitting to the crime, his attorney owed him more effort and investigation than he received. "In assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides." Williams v. Allen, 542 F.3d at 1339 (citing Wiggins, 539 U.S. at 524). Regarding plea offers, the ABA sets the following standards for defense attorneys:

> Defense counsel may engage in plea discussions with the prosecutor. Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial.

Petitioner's Evidentiary Hearing Exhibit 1, American Bar Association Standard 4-6.1, Duty to Explore Disposition Without Trial, subsection (b).

The ABA standards further provide that this "duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the

accused's stated desire to plead guilty." Petitioner's Evidentiary Hearing Exhibit 1, American Bar Association Standard 4-4.1, Duty to Investigate, subsection (a).

Moreover, the more serious the charge, the greater the duty of defense counsel is to conduct a reasonable inquiry into the defendant's case. See, e.g., Rule 4-1.1 of the Rules Regulating the Florida Bar, commentary ("The required attention and preparation [of counsel] are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence."). Thus, while there may be less serious cases, such as time served scenarios or other similar situations, where it may be appropriate for an attorney appointed at arraignment to allow his client to plead guilty and be sentenced at the same proceeding, in this case the charges were simply too serious and the consequences too grave for Gaedtke's lawyer to allow his client to accept the "blue light special" offered by the State at arraignment.

To be sure, the additional efforts required of counsel to meet the minimum requirement of effective representation may not have been great. As Public Defender Purdy testified, "[i]t doesn't have to be . . . a full-blown, cover-every-detail investigation. It has to be an adequate investigation to determine to the satisfaction of

the attorney that the best interest of the client are to resolve the case at that point." EH Tr. at 82.[14]

Admittedly, as will be discussed in more detail in the prejudice analysis, the discovery file that Jacobs was perusing as he was engaged in his brief conversation with Gaedtke showed a strong case for the State. Moreover, Jacobs, as an assistant public defender presumably with knowledge of the culture and practices in St. Johns County at the time, may have had reason to believe that the proposed resolution was in his client's best interest. Yet, if the Sixth Amendment right to effective assistance of counsel is to mean anything, something more here was required, even if it was only a request of the State to leave the plea offer open so that his client, who had just been told by the judge that the plea offer was "always" the best offer and that it was only good for the day, could gather his wits and at least consider his grave situation in a more deliberate and less chaotic circumstance. Moreover, while the Court does not accept all of Gaedtke's testimony about what Jacobs actually said to him during

---

[14] Here, other than reviewing the discovery file and briefly talking with Gaedtke, Jacobs performed no investigation. He did not view the video statement of the alleged victim (or more accurately discover that the recording process had malfunctioned and therefore the video would not be available for trial), he collected no records, he made no attempts to interview or gather information on witnesses, he did not investigate the circumstances under which his client's statement was taken and he failed to thoroughly interview his own client or even see to it that they could have totally private conversations.

their brief meeting and what Gaedtke understood about his situation, after listening to both Gaedtke and Jacobs in person, it is the Court's determination that Jacobs' strong (almost overbearing) personality, combined with his endorsement of the "policy" apparently in place in St. Johns County of strongly encouraging defendants to make plea decisions on the day of arraignment, rendered it difficult for Gaedtke to fully appreciate his situation and make an intelligent decision about what to do.

Public Defender Purdy testified that "if [your client is] going to prison for a case where the plea offer is at arraignment and you haven't had an opportunity to look into it, you might as well not be there." Id. at 79. But, it is really worse than that. In these circumstances, Jacobs in effect became part of the system that was designed to encourage Gaedtke to plead guilty at arraignment without further opportunity to consider his situation. Even under the highly deferential standards of Strickland and Hill, counsel's performance was deficient.[15]

---

[15] Because the state trial court found no prejudice, the state court did not address the deficiency part of the Strickland test. Neither did the state appellate court which per curiam affirmed. Nevertheless, the Court still treats the state court's ultimate decision to deny Gaedtke's ineffectiveness claim as being entitled to deference under AEDPA. Thus, in addition to according the deference required of counsel's performance, the Court is also adding "another layer of deference" to the state court's decision to deny Gaedtke's ineffectiveness claim. Rutherford v. Crosby, 385 F.3d at 1309. However, even according this additional layer of deference, the Court is determining that the state court "applied Strickland to the facts of [this] case in an objectively unreasonable manner." Id. (citation omitted).

Respondents rely on Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984), for the proposition that less is required of counsel in a guilty plea setting. Nevertheless, Wofford still requires that counsel:

> **. . . provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial. To impart such an understanding to the accused, counsel must, after making an independent examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client.**

Id. (citations omitted) (emphasis added).

Gaedtke has borne his heavy burden of showing that counsel's performance was deficient and "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688; see, e.g., Williams v. Allen, 542 F.3d at 1337-42 (generally discussing the deficient performance prong of Strickland and finding deficient performance even under the AEDPA standard).

## 2. Prejudice

Gaedtke contends that he need not show prejudice because it is presumed, citing United States v. Cronic, 466 U.S. 648 (1984). In Cronic, the Supreme Court carved out a narrow exception to Strickland v. Washington's general rule that a defendant claiming ineffective assistance of counsel must demonstrate prejudice. "Circumstances which would warrant a presumption of prejudice from

counsel's ineffectiveness are those where 'the adversary process itself is [rendered] presumptively unreliable [by the circumstances].'" <u>Chadwick v. Green</u>, 740 F.2d 897, 900 (11th Cir. 1984) (quoting <u>Cronic</u>). "<u>Cronic</u>'s presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." <u>Id</u>. at 901. "Consequently, the burden of proof under <u>Cronic</u> is a very heavy one." <u>Smith v. Wainwright</u>, 777 F.2d 609, 620 (11th Cir. 1985).

While the combination of the structural deficiencies in the St. Johns Circuit Court arraignment proceedings, as applied to Gaedtke's case, and counsel's deficient performance raise troubling questions and the Court has strongly considered whether to presume prejudice, it does not appear that Eleventh Circuit precedent would deem that "the circumstances [here] were so prejudicial that competent counsel could not render effective assistance." <u>Frazier v. Sec'y for Dep't of Corr.</u>, 197 Fed. Appx. 868, 872 (11th Cir. 2006) (not selected for publication in the Federal Reporter). Nor is the Court prepared to say that these circumstances represent "a fundamental breakdown of the adversarial process such that prejudice is presumed under <u>Cronic</u>." <u>Chadwick</u>, 740 F.2d at 901. This conclusion is bolstered by the additional overlay of AEDPA deference due to the state court's decision that there was no

prejudice.    See Wright v. VanPatten, 128 S.Ct. 743 (2008)

(rejecting Cronic presumption under § 2254(d) standard); see also

Knowles v. Mirzayance, No. 07-1315, 2009 WL 746274 (U.S. Mar. 24,

2009).[16]

If prejudice cannot be presumed, it must be established under

the Strickland v. Washington and Hill v. Lockhart standards. See,

e.g., Chadwick, 740 F.2d at 901.   Under Hill, in the context of

guilty pleas, the prejudice requirement is satisfied when the

defendant shows "that there is a reasonable probability that, but

for counsel's errors, he would not have pleaded guilty and would

have insisted on going to trial." Hill, 474 U.S. at 59 (footnote

omitted).   The Supreme Court went on to explain:

> In many guilty plea cases, the
> "prejudice" inquiry will closely resemble the
> inquiry engaged in by court's reviewing
> ineffective-assistance challenges to
> convictions obtained through a trial.   For
> example, where the alleged error of counsel is
> a failure to investigate or discover
> potentially exculpatory evidence, the
> determination whether the error "prejudiced"
> the defendant by causing him to plead guilty
> rather than go to trial will depend on the
> likelihood that discovery of the evidence
> would have led counsel to change his
> recommendation as to the plea.   This
> assessment, in turn, will depend in large part
> on a prediction whether the evidence likely
> would have changed the outcome of a trial.

---

[16] While it is not entirely clear whether the state habeas
court found that Gaedtke had failed to adequately allege prejudice
or whether it found that prejudice had not been shown (see supra p.
8), the Court believes that it nevertheless must give deference to
the state court's decision.

. . . .

> As we explained in <u>Strickland v. Washington</u>,
> <u>supra</u>, these predictions of the outcome at a
> possible trial, where necessary, should be
> made objectively without regard for the
> "idiosyncrasies of the particular
> decisionmaker."

<u>Id</u>. at 59-60 (citation omitted); <u>see</u> <u>Long v. United States</u>, 883

F.2d 966, 968 n.4 (11th Cir. 1989) ("In order to establish that

counsel's performance was ineffective, . . . appellant would have

to show that such an investigation would have changed counsel's

recommendation that appellant plead guilty - that is, that the

defense was likely to have succeeded at trial.") (citation

omitted); <u>cf</u>. <u>Esslinger v. Davis</u>, 44 F.3d 1515, 1529 (11th Cir.

1995).

Because, under <u>Hill</u>, the prejudice inquiry is an objective

one, Gaedtke's post-hoc, self-serving testimony that if he had been

well-advised by his counsel, he would have insisted on going to

trial is insufficient. Rather, the Court must look at the record.

While Gaedtke spoke at the hearing about the possible witnesses who

counsel might have contacted on his behalf, he was unable to give

any specifics and tendered no affidavit or other evidentiary

showing of any actual witness who might have been favorable to him.

<u>See</u> <u>e.g.</u>, <u>United States v. Ashimi</u>, 932 F.2d 643, 650 (7th Cir.

1991). Gaedtke suggested at the hearing that he would have liked

his attorney to investigate witnesses whose only testimony would

have been that they had access during the day to Gaedtke's house,

even while at the same time he acknowledged that there were only three people in the house the day of the incident - - himself, his wife and the child victim. Thus, it is highly unlikely that the defense would have been able to establish that the testimony of these unnamed witnesses was even relevant.

Gaedtke claimed that his wife was threatened with incarceration and because of her health problems he and his wife decided to provide to law enforcement false written statements implicating Gaedtke. This argument is not credible since Gaedtke's wife made a statement the day before to the responding deputy which is substantially the same as her written statement provided to the detective during questioning, *i.e.*, that she had taken a nap because she had a headache and thus Gaedtke was alone with the child for approximately thirty minutes.

Petitioner's contention that he was not advised of his <u>Miranda</u> rights is also unmeritorious because there is a signed written waiver of <u>Miranda</u> in the discovery file provided to Gaedtke's attorney. Even in light of Gaedtke's post-hoc allegation regarding the lack of voluntariness of his own confession, it is highly unlikely that the confession would have been suppressed.

Moreover, the State had still more evidence. Presumably, if necessary, the child would have testified in some fashion. Further, the State had in its arsenal the victim's prior consistent statements made to her mother, father and grandmother, which would

be admissible.  See Florida Evidence Code 90.803 (23).[17]  Further, the State had similar act evidence involving Gaedtke's two stepdaughters.  See Fla. Evid. Code § 90.404(2)(b) ("In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."); see also McLean v. State, 934 So.2d 1248, 1263 (Fla. 2006) (upholding the constitutionality of Fla. Evid. Code § 90.404(2)(b)).  Finally, Gaedtke's wife established Gaedtke's access and opportunity to molest his step-granddaughter.  Even assuming Gaedtke's wife changed her testimony at trial, as Gaedtke suggested, the State would have been allowed to impeach Gaedtke's wife with her two prior inconsistent statements to law enforcement. See Fla. Evid. Code § 90.608(1).[18]

Thus, to summarize, the State's evidence consisted of a signed confession of Gaedtke, a sworn statement by his wife that was evidence of Gaedtke's opportunity to commit the crime, likely

---

[17] These statements would be admissible if "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement[s] provide sufficient safeguards of reliability" and - if the victim is unavailable as a witness - there is "other corroborative evidence of the abuse or offense."  Fla. Evid. Code § 90.803 (23).

[18] It appears that the marital privilege would likely be inapplicable in these circumstances.  See 1 Ehrhardt's Florida Practice, Evidence § 504.5 (2008).

evidence from his two adult stepdaughters of Gaedtke's prior molestation of them when they were young, Gaedtke's felony record in Virginia arising from his molestation of his stepdaughters, the testimony of the child victim or at a minimum testimony from those who heard the child victim consistently recount the incident. Moreover, because of the circumstances of the crime, there was no DNA or other forensic evidence that might have helped Gaedtke. Finally, there were apparently no other witnesses and no physical evidence which would have been exculpatory. Even Gaedtke's own expert witness admitted that the State's case against Gaedtke was "strong."[19]

Given this overwhelming evidence, with no likelihood of countervailing evidence, Gaedtke ultimately fails to show he suffered prejudice sufficient to meet the Hill standard. That is, there is nothing to suggest the likelihood that anything that counsel could have or would have done for Gaedtke "would have led counsel to change his recommendation as to the plea," because there is "in turn" no likelihood that any actions by counsel "likely would have changed the outcome of a trial." Hill, 474 U.S. at 59. Indeed, though the Court is critical of the circumstances under which Gaedtke entered his no contest plea, given the tender age of

---

[19] Thus, this is not a case where the defendant has now come forward with evidence, which had his counsel discovered it at the time, might have made a difference. Despite being given the opportunity to present evidence at an evidentiary hearing in this Court, Gaedtke's proof designed to show prejudice is non-existent.

the victim, that Gaedtke had engaged in the same conduct with his now adult stepdaughters when they were young and the overwhelming evidence against Gaedtke, it is very likely that had he gone to trial he would have been found guilty and very possibly received a sentence greater than fifteen years, perhaps even the statutory maximum of thirty years. Thus, "objectively" predicting "the outcome at a possible trial[,]" there is no likelihood that the outcome of a trial would have been more favorable to Gaedtke. Id. at 60.

A federal habeas petitioner has the burden of establishing his right to relief and of proving all facts necessary to show a constitutional violation. Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001) (citation omitted), cert. denied, 535 U.S. 1011 (2002). Gaedtke has failed to establish prejudice under Hill. This means, *ipso facto*, under AEDPA, that Gaedtke has not shown that "in rejecting his ineffective assistance of counsel claim the state court 'applied Strickland to the facts of his case in an objectively unreasonable manner.'" Rutherford, 385 F.3d at 1309 (citation omitted).

### CONCLUSION

In another case, perhaps the next one, the noted deficiencies in the "blue-light special" arraignment proceedings in serious felony cases and counsel's concomitant failure to provide effective representation will be visited upon a different defendant who will

be able to demonstrate the requisite prejudice. If so, this Court will not hesitate to grant habeas relief. However, in Gaedtke's case, notwithstanding his counsel's deficient performance, the overwhelming evidence against him disables him from establishing prejudice.

It is hereby

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2. The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3. The Clerk of the Court shall close this case.

4. If asked, the Court will issue a Certificate of Appealability.

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of March, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

sc 3/25
c:
Counsel of Record
James S. Purdy, Public Defender, Seventh Judicial Circuit